UNITED STATES *v.* ESSO STANDARD OIL CO. (No. 4760)[1]
ESSO STANDARD OIL CO. *v.* UNITED STATES (No. 4763)

---

[1] C. A. D. 546.

United States Court of Customs and Patent Appeals, December 29, 1953

*Warren E. Burger*, Assistant Attorney General (*Richard E. FitzGibbon*, special attorney, of counsel), for the United States.

*Sharretts, Paley & Carter* (*Howard C. Carter* and *Louis J. Paley* of counsel) for importer.

*Lamb & Lerch* (*J. G. Lerch* of counsel), *amicus curiae* for the United States.

*Eugene R. Pickrell, amicus curiae* for Esso Standard Oil Co.

[Oral argument October 7, 1953, by Mr. FitzGibbon, Mr. Lerch, Mr. Carter, and Mr. Pickrell submits on brief]

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY, and JACKSON (retired), Associate Judges

JACKSON, Judge, delivered the opinion of the court:

The merchandise involved herein according to a description on the invoice is "Polymer S-60 Chemicals No. 1 B. N. Synthetic Stylene." It is a copolymer of styrene and isobutylene and is referred to in the record either as "Stylene" or "S Polymer."

The Collector of Customs at the port of New York classified the merchandise pursuant to the provisions of paragraph 28 (a) of the

Tariff Act of 1930 and assessed it for duty at the rate of 45 per centum ad valorem plus 7 cents per pound as a synthetic resin or resin-like product prepared, obtained, derived, or manufactured in whole or in part from one of the products provided for in paragraphs 27 or 1651.

The importer, Esso Standard Oil Co., protested the classification, claiming the goods to be properly dutiable under paragraph 1558 of the Tariff Act as modified by the General Agreement on Tariffs and Trade (G. A. T. T.), T. D. 51802, at 10 per centum ad valorem as synthetic rubber, either directly or by similitude, free of duty under paragraph 1710 of the Act as bitumen, or free of duty under paragraph 1733 of the Act as paraffin, conceding that it would be taxable under section 3422 of the Internal Revenue Code at the rate of ½ cent per pound or dutiable under the provisions of paragraph 1558 as a manufactured article not specially provided for.

The pertinent portions of the involved act read as follows:

Par. 28. Coal-tar products:
(a) * * * synthetic phenolic resin and all resin-like products prepared from phenol, cresol, phthalic anhydride, coumarone, indene, or from any other article or material provided for in paragraph 27 or 1651 * * * and all mixtures including solutions, consisting in whole or in part of any of the articles or materials provided for in this paragraph, excepting mixtures of synthetic odoriferous or aromatic chemicals, 45 per centum ad valorem and 7 cents per pound.

Par. 1558. That there shall be levied, collected, and paid * * * on all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.

The General Agreement on Tariffs and Trade heretofore mentioned carved out of paragraph 1558 a provision for "synthetic rubber and synthetic rubber articles" and fixed the rate of duty thereon at 10 per centum ad valorem.

Par. 1710 (Free List)
Limestone-rock asphalt; asphaltum and bitumen.

Par. 1733 (Free List)
Oils, mineral: Petroleum, crude, fuel, or refined, and all distillates obtained from petroleum, including kerosene, benzine, naphtha, gasoline, paraffin, and paraffin oil not specially provided for.

One of the articles provided for under paragraph 1651 among the coal-tar products is benzene.

The issue was tried in the United States Customs Court before the First Division thereof and judgment pursuant to its decision (C. D. 1441) was duly entered, sustaining the protest of the plaintiff with respect to its claim that the imported merchandise was properly dutiable at 20 per centum ad valorem as an unenumerated manufactured article under paragraph 1558 of the act. All the other claims of the plaintiff were denied.

The Government appealed from that portion of the said judgment, holding the merchandise to be properly dutiable as an unenumerated

manufactured article, and the plaintiff cross-appealed therefrom with respect to the claims that were denied by the trial court.

At the trial, four witnesses appeared to support the contentions of appellant and eleven testified for the defendant. Several samples of the merchandise and certain documentary exhibits were received in evidence.

One of the witnesses for the plaintiff was a chemical engineer employed by the Esso Laboratories of the Standard Oil Development Co. Another witness was likewise an employee of the same company. The third witness for the plaintiff was a professor of organic chemistry at the Polytechnic Institute, Brooklyn. He had outstanding qualifications as a research chemist, had a fine professional background and possessed a splendid education and experience in his profession. The fourth witness for plaintiff was a chemist in the employ of the Hercules Powder Co.

On behalf of the defendant there appeared a chemist who had prior experience in rubber chemistry and was at the time of the trial employed in the United States Laboratory; another a consulting chemist and rubber technologist of wide technical experience as well as being a lecturer in his field; a third witness was Assistant Chief Chemist in the New York Customs Laboratory, whose duty it was to examine merchandise such as that which is here involved; a further witness for the Government was a vice-president of the B. F. Goodrich Chemical Co. in charge of its technical operations who also was a well-qualified chemist with wide experience; a witness who was Director of Research for the Dow Chemical Company at Midland, Michigan, with an impressive educational and experience background then testified for the Government; another witness was the Director of Research for the Plastic Division of Monsanto Chemical Company at Springfield, Massachusetts, who also was highly skilled in chemistry and experienced in the plastic art; a further witness for the Government was the Assistant Director of the Rubber Laboratory of the E. I. duPont de Nemours Company at Deepwater, New Jersey. That witness had an imposing past, both in general and technical education, as well as experience in chemistry. A rubber chemist and technologist affiliated with the American Cynamid Company with a research laboratory in Stamford, Connecticut, appeared for the Government. That witness was the head of the rubber chemical laboratory with a fine professional and educational background; another witness was the engineer of the Development Department of the Thermo-plastic Division of the Union Carbide and Carbon Corp. He was a chemical expert with fine experience and educational background; another witness for the defendant was a chemist employed as Chemical Director of the American Cynamid Company with an imposing background of experience and preparation.

The record as a whole is highly technical and the witnesses appeared to have been doing practical and research work with resins, plastics, and rubber, both natural and synthetic.

According to one of the witnesses for the plaintiff below, who was an employee of the importer, the production of the involved merchandise was as follows:

The raw materials were styrene and isobutylene and they were mixed together and co-polymerized; by that I mean two different types of material were hooked up as distinguished from one material hooked up. They were co-polymerized at a low temperature in the presence of a Friedel-Crafts catalyst. And that produced these long-chain molecules, and this material ended up in a reactor at low temperature in solution. The solution was then vigorously mixed with hot water and the hot water supplied the heat to vaporize all the materials that were not reacted. And this left the Polymer, or Co-Polymer, if you wish, dispersed as a slurry in the hot water. It looked quite a bit like this exhibit No. 2. This slurry was then filtered to take most of the water out and leave the crumb behind. The crumb was then dried. During the process of drying the crumb, particles tend to fuse together a little bit, so it was then run through a cutting machine which broke it up again into this form (indicating) and it was put into boxes.

We agree with the statement in the decision of the trial court that the principal question before us is whether or not the imported merchandise is a synthetic phenolic resin or a resin-like product of the class or kind contemplated by paragraph 28, *supra*.

The origin of the styrene in the copolymer is contended by the Government to have been in benzene which is one of the products mentioned in the said paragraph 1651. None of the witnesses for the importer testified as to the source of the styrene. Their sole testimony in that respect was merely a negation that the Stylene is a resin or resin-like product.

On the contrary, the record on behalf of the Government is replete with testimony that styrene is derived from benzene, which is a coal-tar product. Furthermore, in the brief of counsel for the cross-appellant it is conceded that styrene is derived or manufactured by reacting benzene and ethylene to form ethyl benzene, which is dehydrogenated to form styrene. Even though it be admitted that styrene is not directly *prepared from benzene*, it seems to us from the concession made, that the styrene was obtained, derived, and manufactured in whole or in part from one of the products, namely benzene, which appears as hereinbefore set out as a coal-tar product in paragraph 1651, *supra*.

In its decision, the trial court relied heavily upon the testimony of the professor of organic chemistry at the Polytechnic Institute, Brooklyn, who appeared for the plaintiff, and quoted at considerable length from his testimony. The witness made his determination as to whether a material is a resin or resin-like product by stating that a *typical* resin is an organic substance of molecular weight of between 500 and 1500 and that in shape it is usually irregular; that the molec-

ular chains are not regular but contain links and side chains. He then mentioned as having that characteristic phenolic resins, coumarone resins, wood resins, or carnauba resins. He stated that, because of the structural factors, resins at room temperature are brittle, "pliable," (sic) and generally show conchoidal fractures; that if struck with a hammer resins disintegrate into many parts; and that they will soften if heated and solidify on re-cooling but do not crystallize.

That witness stated that the distinguishing characteristics of plastics are the high molecular weight, 30,000 to 100,000 or more, that they are extrudable and shapeable, and that "so-called rubber plastics reveal elasticity or reversability." *The witness stated he would not call the imported goods typical resins but rather a plastic.* He stated that the words resin and plastic have been and still are being used to some extent interchangeably but he does not think that should be because of the distinctions we have just set out as having been stated by him. He concluded that the properties of the imported merchandise are "quite characteristic for plastics, rubbers, rubbery plastics" and "not observed with *typical resins.*"

One of plaintiff's witnesses, when confronted with an excerpt from a lecture given by him which appeared in the June 1950 issue of "Modern Packaging," in which he referred to all "S Polymers" with others as *a family of resins,* stated on the witness stand that technically they are not resins. The same witness in an article appearing in the "India Rubber World" in May 1949 referred to the imported merchandise as *resins.*

One of the exhibits of the importer describing S-Polymers, among other things, contains the following: "Form: colorless, soft and elastic to *resinous polymers*" and further under the heading of processability "B" it is stated that the imported merchandise *blends with other resins.*

The great bulk of the record on behalf of the importer appears to be directed to its contention that the imported merchandise is a synthetic rubber. With respect to that phase of the issue, we agree with the statement appearing in the decision of the trial court that the likenesses of the imported merchandise with reference to tensile strength, specific gravity, solubility, molecular weight, elongation, and water impermeability are also found in synthetic rubber, but those likenesses are merely superficial and only apply within certain narrow regions of both products and are not substantially effective to establish proper classification of the imported merchandise as synthetic rubber.

We further agree with the statement in the decision below that all of the experts in the rubber industry appearing on behalf of the Government convincingly established that capability of vulcanization and elasticity are vitally essential to all rubbers. There can be no question but that the imported goods cannot be vulcanized and have not the property of elasticity such as are necessary characteristics of rubber, either natural or synthetic.

We are of the opinion that the entire record on behalf of the importer lacks the clarity and positiveness necessary to squarely prove that the imported merchandise is not a resin-like substance. The principal witness on its behalf expressed merely his personal opinion that the importation is not typical resin but rather a plastic and that he would call it a plastic.

Furthermore, we think that the testimony presented on behalf of the Government which included testimony of highly skilled technicians from the cream of the technical chemical industry in the United States should be accorded greater weight than that of a professor, who is also a chemist, when none of his experience in the United States has been in the chemical industry.

Another witness appearing on behalf of the importer stated that, in his opinion, there was no significant amount of styrene present in coal tar but that benzene is produced from coal tar by distillation. He further stated that, unless new processes such as azeotropic distillation are used, styrene when it is produced is mixed with the xylo fraction; however, he admitted that there are new techniques from which the conclusion, in our opinion, is clear that with such techniques styrene can be produced without being mixed with the said fraction. The witness stated he would not venture an opinion as to the imported material being a thermoplastic resinous product because he was not too familiar with nor an authority on its properties.

It seems to us that the situation was very well described in an answer to a question of one of the witnesses for the defendant by Chief Judge Oliver. The witness stated that all resins are plastics but all plastics are not resins.

Government counsel in their brief cite the case of *Kuttroff, Pickhardt & Co., Inc.* v. *United States*, 21 C. C. P. A. (Customs) 332, T. D. 46864, in which the question of whether or not certain paint used on automobile bodies, of which one component part was a synthetic resin, was properly dutiable under paragraph 28 of the Tariff Act of 1922 as a mixture in whole or in part of resin-like products prepared from phenol. In that case this court affirmed the judgment of the lower court sustaining classification of the imported paint under paragraph 28. In the course of that opinion this court quoted with approval a statement of the lower tribunal in the case of *In re Pickhardt & Kuttroff*, T. D. 20728, 1 Treas. Dec. 372, as follows:

> The ordinary and commonly accepted meaning of the words "derived from" is "made or prepared from," "produced from," or "obtained from." The words "dyes derived from anthracin" means dyes of which anthracin is the source or base. They do not mean anthracin itself, nor dyes made wholly of anthracin, but dyes produced or obtained from anthracin by the extraction of some of its elements and their utilization by actual substitution with other substances. If the manufacturer starts with anthracin, and, by partial replacement or any other process, produces a dye, that dye is *derived* from anthracin, but not otherwise.

The interpretation, in this respect, should be similar to that applied to the tariff provision for "preparations of coal tar" (*In re Roessler & Hasslacher Chemical Company*, 49 Fed. Rep., 272; affirmed, 56 Fed. Rep., 481). (Italics quoted.)

This court then further stated:

We have not overlooked appellant's argument to the effect that Congress in (a) of said paragraph 28 has used the word "prepared," and in (b) has used the term "obtained, derived, or manufactured in whole or in part from," and that in construing somewhat similar tariff enactments the courts have held that by such use of terms Congress meant to distinguish between them and did not use them synonymously. We are cognizant of the fact that our holding here results in giving the same effect to the term "prepared from" as would ordinarily be given if the term "derived from" had been used.

We do not mean to hold that such terms, when found in statutes, are always to be regarded as synonymous. In construing statutes, however, the master rule is to ascertain the legislative intent. *United States* v. *Clay Adams Co., Inc.*, 20 C. C. P. A. (Customs) 285, T. D. 46078. We cannot conclude that Congress, by the use of the two terms under discussion, intended such a result as is contended for here by appellant.

We have in mind the history of the times, prior to and on the date of the enactment of the provisions here under consideration, and what Congress sought to accomplish by the legislation, all of which is so generally known as to require no recital here. It will be noted that the first words in said paragraphs 27 and 28 are "Coal-tar products:" and that following this term is a recital, in great detail, of the different articles and materials which it sought to bring within the paragraphs. A study of the two paragraphs and the act as a whole prompts the conclusion that Congress was anxious to include within the said paragraphs most, if not all, coal-tar products, except those which were provided for elsewhere in the act. To accomplish this purpose it named definitely a great number of articles and materials, and then, by several general, comprehensive catch-all provisions, further greatly broadened and enlarged the scope of the paragraphs.

We agree with that reasoning. In our opinion, the record here, taken as a whole, shows that the great preponderance of evidence supports the classification of the collector and, for that reason, the judgment of the lower court, with respect to its holding that the imported merchandise is properly classifiable as an unenumerated manufactured article, is reversed. In our opinion, the importation is a resin-like substance or material. Therefore, it is not necessary to consider the cross appeal filed on behalf of the importer.

Several citations from chemical publications have been cited by both parties. Those for the importer were intended to support its contention that the difference between resin and plastics that are not resins depends upon the difference in molecular weight. Those cited by counsel for the Government made no such distinction. The testimonial record on the part of plaintiff clearly shows that the terms "plastics" and "resins" are used interchangeably and the employment of "molecular weight" as the norm of difference appears to be a matter of technical personal choice.

It may be not inappropriate to again quote from the record that "all resins are plastics but not all plastics are resins." Whether in

respect to "typical resins" the molecular weight thereof is quite low as compared with like weight of "plastics" we are not called upon to decide. The involved merchandise, in our opinion, based on the entire record, is not a "typical resin." It is a resinoid or resin-like substance and the pertinent statute does not require it to be a "typical resin."

Our conclusion in that respect is fortified by what we find in Hackh's Chemical Dictionary, Third Edition, from which the following is quoted:

styrene. (1) $C_8H_8$=104.1. Cinnamene, styrolene, Phenethylene, *styrol*, vinylbenzene, phenylethylene, Ph.CH:CH₂. A constituent of storax, essential oils, and *coal tar*. (Italics added).

On page 665 of that publication, under the heading of "Synthetic Plastics," we find "Styrol resins," among other products, which obviously, in view of the quoted definition of "styrene" is a synthetic resin.

On page 734 of the same dictionary "Resinoid" is defined as a "substance that resembles a resin in its physical properties, but differs by having a heat hardening character, *i. e.*, changing from a soluble and fusible solid to an insoluble and infusible solid on heating. *cf. plastics*" (Italics quoted.)

For the reasons hereinbefore set out, the judgment of the trial court is *reversed* as to its holding that the importation is properly dutiable as an unenumerated manufactured article and *affirmed* as to its denial of the other claims in the protest.

WILLIAM P. COLE, JR., Judge, having participated below, disqualified himself to sit in this case and JACKSON, Judge, retired, was recalled to participate herein.